**F I L E D**
CLERK, U.S. DISTRICT COURT

05/05/2026

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ GSA _____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

February 2026 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>      v.<br><br>TYSON JAMERSON,<br>  aka "West Coast,"<br>  aka "West,"<br>JAIDYN NYLE STEINBERG,<br>  aka "Sky,"<br>  aka "Bunny,"<br>AHLIYAH MONIQUE HINOJOSA TAVIE,<br>  aka "Tati,"<br>  aka "Mrs. West Coast,"<br><br>      Defendants. | CR 2:26-cr-00279-FLA<br><br>I N D I C T M E N T<br><br>[18 U.S.C. § 1594(c): Conspiracy to Commit Sex Trafficking of a Minor; 18 U.S.C. § 1591(a)(1), (b)(2), (c): Sex Trafficking of a Minor; 18 U.S.C. § 2260A: Commission of a Felony Offense Involving a Minor While Required to Register as a Sex Offender; 18 U.S.C. § 1594(c): Conspiracy to Commit Sex Trafficking Through Force, Threats of Force, Fraud, or Coercion; 18 U.S.C. § 1591(a)(1), (b)(1): Sex Trafficking Through Force, Threats of Force, Fraud, or Coercion; 18 U.S.C. § 875(c): Threats by Interstate Communication; 18 U.S.C. §§ 1594(d), 2253, 981 and 28 U.S.C. § 2461: Criminal Forfeiture] |

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 1594(c)]

[DEFENDANTS JAMERSON AND HINOJOSA TAVIE]

A.   OBJECT OF THE CONSPIRACY

Beginning on or about September 22, 2025, and continuing to on or about September 24, 2025, in Los Angeles and San Bernardino Counties, within the Central District of California, and elsewhere, defendants TYSON JAMERSON, also known as ("aka") "West" and "West Coast," and AHLIYAH MONIQUE HINOJOSA TAVIE, aka "Tati" and "Mrs. West Coast," conspired with each other and others known and unknown to the Grand Jury to knowingly, in and affecting interstate and foreign commerce, recruit, entice, harbor, transport, provide, obtain, and maintain Victim 1, a then-15-year-old girl, having had a reasonable opportunity to observe Victim 1 and knowing and in reckless disregard that Victim 1 was under the age of 18 years old and knowing and in reckless disregard that Victim 1 would be caused to engage in a commercial sex act, in violation of Title 18, United States Code, Section 1591(a)(1), (b)(2), and (c).

B.   MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE     ACCOMPLISHED

The object of the conspiracy was to be accomplished, in substance, as follows:

1.   Defendant HINOJOSA TAVIE would approach Victim 1 on foot, recruit her to commit commercial sex work, and exchange contact information.

2.   Defendant JAMERSON would continue to recruit Victim 1 via text message, with flattery and false promises.

3.   Defendants JAMERSON and HINOJOSA TAVIE would approach Victim 1 in a car, pick her up, and take her to purchase clothing for use in commercial sex work.

4.    Defendants JAMERSON and HINOJOSA TAVIE would bring Victim 1 to a hotel where defendant JAMERSON would provide Victim 1 with drugs, and defendants JAMERSON and HINOJOSA TAVIE would pressure Victim 1 to ingest them.

5.    Defendant JAMERSON would instruct Victim 1 to wear the clothing he had purchased for Victim 1 to use in commercial sex work, as well as a wig he provided, and would photograph Victim 1 and defendant HINOJOSA TAVIE together.

6.    Defendant JAMERSON would use the photographs of Victim 1 and defendant HINOJOSA TAVIE to create advertisements that he and defendant HINOJOSA TAVIE would post to an online platform used for commercial sex.

7.    Defendants JAMERSON and HINOJOSA TAVIE would transport Victim 1 to "blades," that is, areas notorious for commercial sex work, and instruct her to solicit sex customers.

8.    Defendant JAMERSON would order Victim 1 to follow certain rules while engaging in commercial sex work, including earning a daily quota of $1,000, remitting all commercial sex proceeds to defendant JAMERSON, charging customers the prices that defendant JAMERSON set for commercial sex acts, and working the hours that defendant JAMERSON demanded of her.

9.    Defendant HINOJOSA TAVIE would monitor Victim 1 during her commercial sex dates and harbor Victim 1 at a hotel.

10.    Defendant JAMERSON would collect all cash proceeds Victim 1 made from commercial sex acts, and defendant HINOJOSA TAVIE would collect payments from Victim 1's customers who paid via a mobile banking application, such as Cash App.

C.   OVERT ACTS

In furtherance of the conspiracy and to accomplish its object, on or about the following dates, defendants JAMERSON and HINOJOSA TAVIE, and others known and unknown to the Grand Jury, committed various overt acts in Los Angeles and San Bernardino Counties, within the Central District of California, and elsewhere, including, but not limited to, the following:

Overt Act No. 1:   On September 22, 2025, in an effort to recruit Victim 1 for commercial sex work, defendant HINOJOSA TAVIE approached Victim 1 on G Street in San Bernardino, a street notorious for commercial sex work, flattered Victim 1, and asked for her contact information.

Overt Act No. 2:   On September 22, 2025, defendant HINOJOSA TAVIE provided Victim 1's contact information to defendant JAMERSON for the purpose of recruiting Victim 1 for commercial sex work.

Overt Act No. 3:   On September 22, 2025, defendant JAMERSON, through a series of text messages, flattered Victim 1 and enticed her to engage in commercial sex work, promising to "elevate" and enrich Victim 1, and further promised to get her an account on a website for commercial sex advertisements, even if she did not have an identification card.

Overt Act No. 4:   On September 23, 2025, via text messages sent at approximately 11:55 a.m., defendant HINOJOSA TAVIE contacted Victim 1 to recruit her for commercial sex work, and told Victim 1 that defendant HINOJOSA TAVIE was on her way to pick up Victim 1.

Overt Act No. 5:   On September 23, 2025, defendants JAMERSON and HINOJOSA TAVIE picked up Victim 1, took her to a store, and bought her clothing to use for commercial sex work.

4

Overt Act No. 6:   On September 23, 2025, defendants JAMERSON and HINOJOSA TAVIE drove Victim 1 to the Airport Stay Motel in Ontario, where they checked into a room reserved under defendant HINOJOSA TAVIE's name.

Overt Act No. 7:   On September 23, 2025, in a room at the Airport Stay Motel, defendants JAMERSON and HINOJOSA TAVIE instructed Victim 1 to change into clothing for commercial sex work, which consisted of a black fishnet outfit that they had purchased for her, and a wig.

Overt Act No. 8:   On September 23, 2025, in a room at the Airport Stay Motel, defendant JAMERSON instructed Victim 1 on how to pose for photographs, and photographed defendant HINOJOSA TAVIE posing provocatively with Victim 1.

Overt Act No. 9:   On September 23, 2025, in a room at the Airport Stay Motel, defendant JAMERSON provided Victim 1 with cocaine and marijuana, and defendants JAMERSON and HINOJOSA TAVIE pressured Victim 1 to consume the drugs.

Overt Act No. 10:   On September 23, 2025, defendant JAMERSON informed Victim 1 that he was now her pimp and ordered her to follow certain rules, including that Victim 1: meet a daily quota of $1,000 in commercial sex proceeds, all of which she was required to remit to defendant JAMERSON; do not stop working until the quota is met; pay defendant JAMERSON a $10,000 "fee" for his "pimping" services; charge customers set prices for commercial sex acts, which were set by defendant JAMERSON; work from 10 a.m. to 5:00 a.m. every day; send text messages to defendant JAMERSON when she secured or finished a commercial sex date; inform defendant JAMERSON about the money she made from each commercial sex date; and do not leave defendant

5

HINOJOSA TAVIE's sight, even if Victim 1 had to use the bathroom or take a shower.

Overt Act No. 11:   On September 23, 2025, defendant JAMERSON transported Victim 1 and defendant HINOJOSA TAVIE to a street where they performed commercial sex work, and where defendant HINOJOSA TAVIE monitored Victim 1's commercial sex dates.

Overt Act No. 12:   From September 23, 2025, through September 24, 2025, defendant HINOJOSA TAVIE monitored Victim 1's commercial sex dates and harbored Victim 1 at a room in the Airport Stay Motel.

Overt Act No. 13:   From September 23, 2025, through September 24, 2025, defendant JAMERSON collected the cash that Victim 1 made from commercial sex dates; defendant HINOJOSA TAVIE instructed Victim 1 to hide commercial sex proceeds in Victim 1's wig until defendant JAMERSON could collect the money; and defendant HINOJOSA TAVIE collected commercial sex proceeds in her mobile accounts when a customer paid via a mobile banking application.

Overt Act No. 14:   On September 23, 2025, via text messages, starting around 4:43 p.m., defendant JAMERSON reminded Victim 1 to message him when she secured a commercial sex date, how much she made, and whether the date was in a car or a hotel room.

Overt Act No. 15:   On September 23, 2025, around 5:10 p.m., defendant HINOJOSA TAVIE informed defendant JAMERSON via text message that she and Victim 1 had secured a double date for $200, that is, a commercial sex date in which both Victim 1 and defendant HINOJOSA TAVIE performed sex acts on the customer.  Defendant JAMERSON replied via text message, ordering that Victim 1 "do most" of the date, meaning Victim 1 needed to perform most of the sex acts.  Defendant

6

HINOJOSA TAVIE replied by applying the "heart emoji" to defendant JAMERSON's message.

Overt Act No. 16:   On September 23, 2025, around 5:52 p.m., after the double date and per defendant JAMERSON's orders, Victim 1 informed defendant JAMERSON via text message that she made $130 from the date and defendant HINOJOSA TAVIE made $120 from the date.

Overt Act No. 17:   On September 23, 2025, via text message, defendant JAMERSON informed Victim 1 that he was applying the $130 that she made from the date towards her $1,000 daily quota and his $10,000 "fee."

Overt Act No. 18:   On September 23, 2025, at around 6:09 p.m., defendant JAMERSON sent defendant HINOJOSA TAVIE the photographs that he took of Victim 1 and defendant HINOJOSA TAVIE posing together in lingerie.

Overt Act No. 19:   On September 23, 2025, at around 6:18 p.m., defendant HINOJOSA TAVIE told defendant JAMERSON that she and Victim 1 had performed commercial sex acts and received $60 each via Cash App.

Overt Act No. 20:   On September 23, 2025, via a text message sent at around 6:36 p.m., defendant JAMERSON informed Victim 1 that she had made $190 of her $1,000 daily quota and $10,000 "fee."

Overt Act No. 21:   On September 23, 2025, at approximately 6:56 p.m., defendants JAMERSON and HINOJOSA TAVIE posted a commercial sex advertisement featuring Victim 1 and defendant HINOJOSA TAVIE, which offered a "double" with the two females and instructed customers to call defendant HINOJOSA TAVIE's cellphone number to arrange a commercial sex date.

Overt Act No. 22: On September 23, 2025, at approximately 9:55 p.m., defendants JAMERSON and HINOJOSA TAVIE reposted a commercial sex advertisement featuring Victim 1 and defendant HINOJOSA TAVIE, which offered a "double" with the two females and instructed customers to call defendant HINOJOSA TAVIE's cellphone number to arrange a commercial sex date.

Overt Act No. 23: On September 23, 2025, via a text message sent at around 10 p.m., defendant HINOJOSA TAVIE sent Victim 1 the photographs that defendant JAMERSON took of Victim 1 and defendant HINOJOSA TAVIE posing together in lingerie.

Overt Act No. 24: On September 23, 2025, defendant HINOJOSA TAVIE transported Victim 1 to Beverly Hills to engage in a commercial sex work.

Overt Act No. 25: On September 24, 2025, via a text message sent at around 1:42 a.m., defendant JAMERSON informed Victim 1 that she had made $260 of her $1,000 daily quota and $10,000 "fee."

Overt Act No. 26: On September 24, 2025, via a text message sent at around 3:52 a.m., defendant JAMERSON instructed Victim 1 to secure another commercial sex date before he would allow her to stop working for the night.

Overt Act No. 27: On September 24, 2025, at approximately 4:14 a.m., defendants JAMERSON and HINOJOSA TAVIE reposted a commercial sex advertisement featuring Victim 1 and defendant HINOJOSA TAVIE, which offered a "double" with the two females and instructed customers to call defendant HINOJOSA TAVIE's cellphone number to arrange a commercial sex date.

Overt Act No. 28: On September 24, 2025, via a text message sent at approximately 6:22 a.m., defendant HINOJOSA TAVIE sent Victim

1 the address of the Airport Stay Motel where defendants JAMERSON and HINOJOSA TAVIE were harboring Victim 1.

Overt Act No. 29:  On September 24, 2025, via a text message sent at approximately 12:00 p.m., defendant HINOJOSA TAVIE instructed Victim 1 to bring the motel room key back to defendant HINOJOSA TAVIE.

Overt Act No. 30:  From September 22, 2025, through September 24, 2025, defendants JAMERSON and HINOJOSA TAVIE gave Victim 1 two lines of cocaine approximately four times a day so that Victim 1 would be able to stay awake and work long shifts as a commercial sex worker.

Overt Act No. 31:  From September 22, 2025, through September 24, 2025, defendants JAMERSON and HINOJOSA TAVIE transported Victim 1 to streets notorious for commercial sex work in Los Angeles (Figueroa Street), San Bernardino (G Street), and Pomona (Holt Avenue), where they required Victim 1 to engage in commercial sex work.

COUNT TWO

[18 U.S.C. § 1591(a)(1), (b)(2), (c); 18 U.S.C. § 2(a)]

[DEFENDANTS JAMERSON AND HINOJOSA TAVIE]

Beginning on or about September 22, 2025, and continuing to on or about September 24, 2025, in Los Angeles and San Bernardino Counties, within the Central District of California, and elsewhere, in and affecting interstate commerce, defendants TYSON JAMERSON, also known as ("aka") "West" and "West Coast," and AHLIYAH MONIQUE HINOJOSA TAVIE, aka "Tati" and "Mrs. West Coast," each aiding and abetting the other, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained Victim 1, a then-15-year-old girl, having had a reasonable opportunity to observe Victim 1 and knowing and in reckless disregard that Victim 1 was under the age of 18 years old, and knowing and in reckless disregard that Victim 1 would be caused to engage in a commercial sex act.

COUNT THREE

[18 U.S.C. § 2260A]

[DEFENDANT JAMERSON]

Beginning on or about September 22, 2025, and continuing to on or about September 24, 2025, in Los Angeles and San Bernardino Counties, within the Central District of California, and elsewhere, defendant TYSON JAMERSON, also known as "West" and "West Coast," being required by California law to register as a sex offender, committed a felony offense involving a minor in violation of Title 18, United States Code, Sections 1594(c) and 1591(a)(1), (b)(2), (c), namely, Conspiracy to Commit Sex Trafficking of a Minor and Sex Trafficking of a Minor, as charged in Counts One and Two of this Indictment.

COUNT FOUR

[18 U.S.C. § 1594(c)]

[DEFENDANTS JAMERSON AND STEINBERG]

A.   OBJECT OF THE CONSPIRACY

Beginning on a date unknown to the Grand Jury and continuing to on or about February 8, 2026, in Los Angeles and San Bernardino Counties, within the Central District of California, and elsewhere, defendants TYSON JAMERSON, also known as ("aka") "West" and "West Coast," and JAIDYN NYLE STEINBERG, aka "Sky" and "Bunny," conspired with each other and others known and unknown to the Grand Jury to knowingly, in and affecting interstate commerce, recruit, entice, harbor, transport, provide, obtain, maintain, and solicit by any means Victim 2, knowing and recklessly disregarding that force, threats of force, fraud, and coercion, as defined in Title 18, United States Code, Section 1591(e)(2), and any combination of such means, would be used to cause Victim 2 to engage in a commercial sex act, in violation of Title 18, United States Code, Section 1591(a)(1), (b)(1).

B.   MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE ACCOMPLISHED

The object of the conspiracy was to be accomplished, in substance, as follows:

1.   Defendant STEINBERG would recruit Victim 2 to engage in commercial sex work for defendant JAMERSON.

2.   Defendant JAMERSON would entice Victim 2 to work for him as a commercial sex worker by falsely promising her that he would help her save money for an apartment and a car.

12

3.    Defendant JAMERSON would meet with Victim 2 at a hotel to persuade Victim 2 to work for him as a commercial sex worker.

4.    Defendants JAMERSON and STEINBERG would transport Victim 2 to a hotel where they harbored Victim 2 with defendant STEINBERG and another co-conspirator.

5.    Defendants JAMERSON and STEINBERG would transport Victim 2 to an Airbnb rental property where defendant STEINBERG, Victim 2, and another co-conspirator would stay, and where defendant STEINBERG would monitor Victim 2.

6.    Defendant STEINBERG would monitor Victim 2 when they traveled to and from a street where they engaged in commercial sex acts (also known as "blades").

7.    Defendant JAMERSON would order Victim 2 to follow certain rules while engaging in commercial sex work, including earning a daily quota of $1,000, remitting all commercial sex proceeds to defendant JAMERSON, charging customers the prices that defendant JAMERSON set for commercial sex acts, and working the hours that defendant JAMERSON demanded of her.

8.    Defendant JAMERSON would restrict Victim 2's communication with friends and family and would not permit Victim 2 to leave the Airbnb rental property without his permission.

9.    Defendant JAMERSON would threaten Victim 2's life and coerce Victim 2 by causing her to believe that her physical, psychological, and financial well-being would be in jeopardy if she did not work for him as a commercial sex worker and provide him with all of the proceeds from her commercial sex work.

13

C.    OVERT ACTS

In furtherance of the conspiracy and to accomplish its object, on or about the following dates, defendants JAMERSON and STEINBERG, and others known and unknown to the Grand Jury, committed various overt acts in Los Angeles and San Bernardino Counties, within the Central District of California, and elsewhere, including, but not limited to, the following:

Overt Act No. 1:    On November 30, 2025, at a blade located around Western Avenue in Hollywood, defendant STEINBERG recruited Victim 2 to engage in commercial sex work for defendant STEINBERG's "pimp," that is, defendant JAMERSON.

Overt Act No. 2:    On November 30, 2025, defendant STEINBERG obtained Victim 2's contact information, including her Instagram username, and sent the information to defendant JAMERSON.

Overt Act No. 3:    On November 30, 2025, in a series of direct messages on Instagram, defendant JAMERSON told Victim 2 that he was an expert in commercial sex work and recruited Victim 2 through flattery and with false promises of helping her make money for her future, including for down payments on an apartment and a car.

Overt Act No. 4:    On November 30, 2025, defendant JAMERSON met with Victim 2 at the Starlight Inn Motel in Hollywood, where he enticed her to work for him as a commercial sex worker, convinced her to leave with him that night, and collected $500 from Victim 2, her commercial sex proceeds from the previous night.

Overt Act No. 5:    On November 30, 2025, defendant JAMERSON drove defendant STEINBERG and Victim 2 to a hotel where defendant STEINBERG stayed with and monitored Victim 2 for the night.

14

Overt Act No. 6: On November 30, 2025, defendant JAMERSON ordered Victim 2 to follow certain rules, including that Victim 2: meet a daily quota of $1,000 in commercial sex proceeds, all of which she was required to pay to defendant JAMERSON; work every day and do not stop working until she met her daily quota; charge set prices for commercial sex acts, which were set by defendant JAMERSON; send text messages to defendant JAMERSON when she secured a commercial sex date; do not communicate with family or friends; do not leave the Airbnb rental property without defendant JAMERSON's permission; bring defendant STEINBERG or defendant JAMERSON's other trusted sex worker with her wherever she went; pay defendant JAMERSON a $20,000 "fee" for his "pimping" services before she could keep any proceeds from her commercial sex work.

Overt Act No. 7: On November 30, 2025, via text messages and per defendant JAMERSON's instructions, Victim 2 reported to defendant JAMERSON that she had secured a date, completed a date, and earned $160.

Overt Act No. 8: On November 30, 2025, via text message, defendant JAMERSON informed Victim 2 that he was applying the $160 that she had earned towards her $1,000 daily quota and $20,000 "fee."

Overt Act No. 9: On December 1, 2025, at approximately 1:24 a.m., defendant JAMERSON informed Victim 2 that she had earned $600 towards her $1,000 daily quota and $20,000 "fee."

Overt Act No. 10: On December 1, 2025, via a text message sent at approximately 3:01 a.m. and per defendant JAMERSON's instructions, Victim 2 reported to defendant JAMERSON that she had secured a commercial sex date for $120, and defendant JAMERSON later replied that Victim 2 had met $660 of her daily quota.

15

Overt Act No. 11:    On December 1, 2025, defendant JAMERSON drove Victim 2 and defendant STEINBERG to an Airbnb rental property in Ontario, where defendant STEINBERG stayed with and monitored Victim 2 for the next three days.

Overt Act No. 12:    On December 1, 2025, at approximately 7:06 p.m., defendant JAMERSON sent Victim 2 photographs of Victim 2 in lingerie for the purpose of creating commercial sex advertisements.

Overt Act No. 13:    On December 2, 2025, at approximately 2:09 a.m., defendant JAMERSON, using coded language, told Victim 2 to repost her commercial sex advertisement.

Overt Act No. 14:    On December 2, 2025, at approximately 4:56 p.m., per defendant JAMERSON's instructions, Victim 2 reported to defendant JAMERSON that she had made $120 from a commercial sex date.

Overt Act No. 15:    On December 2, 2025, at approximately 6:55 p.m., defendant JAMERSON informed Victim 2 that she had made $200 of her daily quota and paid $1,260 of the $20,000 "fee."

Overt Act No. 16:    On December 3, 2025, at approximately 9:45 p.m., per defendant JAMERSON's instructions, Victim 2 reported that she had secured a commercial sex date for $200.

Overt Act No. 17:    On December 3, 2025, at 10:59 p.m., defendant JAMERSON informed Victim 2 that she had made $340 of her daily quota and paid $1,600 of the $20,000 "fee."

Overt Act No. 18:    On December 4, 2025, at approximately 4:46 a.m., defendant JAMERSON ordered Victim 2 to stay outside and continue soliciting commercial sex dates, and denied her permission to sleep until she made more money.

Overt Act No. 19:    On December 4, 2025, at approximately 5:30 a.m., per defendant JAMERSON's instructions, Victim 2 reported to

defendant JAMERSON that she had earned $80 from a commercial sex date, and defendant JAMERSON responded by informing Victim 2 that that she had made $440 of her daily quota and paid $1,680 of the $20,000 "fee."

Overt Act No. 20:   On December 4, 2025, defendant JAMERSON berated Victim 2 for refusing to let defendant STEINBERG use Victim 2's rental car, and told Victim 2 she was a "raggedy black bitch" who was inferior to his white sex worker, defendant STEINBERG.

Overt Act No. 21:   On December 6, 2025, using coded language in an Instagram message, defendant JAMERSON threatened to assault Victim 2 the next time he saw her working as a commercial sex worker.

Overt Act No. 22:   On December 7, 2025, through a series of coded messages on Instagram, defendant JAMERSON told Victim 2 that he would assault her as soon as he saw one of her commercial sex advertisements or if he saw her working on any of the "blades," and further told her, "You won't make no money on the blades."

Overt Act No. 23:   On December 7, 2025, through a series of coded messages on Instagram, defendant threatened to assault Victim 2 for failing to pay him all of her commercial sex proceeds and vowed to make an "example" of her for disrespecting him in front of his "whole stable," that is, the other sex workers who worked under defendant JAMERSON's control, and further threatened, "I'm coming for your ass."

Overt Act No. 24:   On December 7, 2025, through a series of coded messages on Instagram, defendant JAMERSON vowed to find and assault Victim 2, stating, "Do you think you're gonna lie to me in front of my whole stable?  Do you think you're gonna get away with that shit bitch you honestly think I'm the type of person to let you

17

get away with that?  When you post, I will come see you promise. Till we meet again!"

Overt Act No. 25:  On December 9, 2025, defendant JAMERSON and STEINBERG harassed Victim 2 for disobeying and leaving defendant JAMERSON.  During one instance, defendant JAMERSON drove to a street where Victim 2 was soliciting commercial sex work, berated her from his car, and approached Victim 2 on foot and repeatedly accused her of "stealing" from him and failing to pay him the commercial sex proceeds that she had earned on the last day she worked for him.

Overt Act No. 26:  On December 9, 2025, defendant STEINBERG threatened to stab Victim 2 if Victim 2 defended herself, and defendant JAMERSON followed and harassed Victim 2 until she threatened to call the police.

Overt Act No. 27:  On January 31, 2026, after he was arrested by law enforcement and placed in custody, defendant JAMERSON put defendant STEINBERG in charge of his sex trafficking business, which included the supervision of his other sex worker.

Overt Act No. 28:  On February 7, 2026, defendant STEINBERG approached Victim 2 on the blade in Pomona, fought Victim 2, and stabbed Victim 2 in the abdomen with a pocketknife, causing a deep laceration.

Overt Act No. 29:  On February 7, 2026, defendant STEINBERG's co-conspirator, another sex worker who worked for defendant JAMERSON, tackled Victim 2 to the ground.

Overt Act No. 30:  On February 8, 2026, on a recorded jail call, defendant STEINBERG reported to defendant JAMERSON that she had stabbed Victim 2, and defendant JAMERSON responded by praising her for the stabbing, stating that she did a "good job," and stating that

18

the other sex worker who assisted defendant STEINBERG in the attack had done "exactly what [she was] supposed to do."

COUNT FIVE

[18 U.S.C. § 1591(a)(1), (b)(1); 18 U.S.C. § 2(a)]

[DEFENDANTS JAMERSON AND STEINBERG]

Beginning on or about November 30, 2025, and continuing to on or about February 8, 2026, in Los Angeles and San Bernardino Counties, within the Central District of California, and elsewhere, defendants TYSON JAMERSON, also known as ("aka") "West" and "West Coast," and JAIDYN STEINBERG, aka "Sky" and "Bunny," each aiding and abetting the other, in and affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, maintained, and solicited by any means, Victim 2, knowing and recklessly disregarding that force, threats of force, fraud, and coercion, as defined in Title 18, United States Code, Section 1591(e)(2), and any combination of such means, would be used to cause Victim 2 to engage in a commercial sex act.

COUNT SIX

[18 U.S.C. § 875(c)]

[DEFENDANT JAMERSON]

From on or about December 6, 2025, and continuing to on or about December 7, 2025, in Los Angeles and San Bernardino Counties, within the Central District of California, and elsewhere, defendant TYSON JAMERSON, also known as "West" and "West Coast," with intent to issue a threat, and with knowledge and reckless disregard that it would be viewed as a threat, knowingly transmitted in interstate commerce an electronic communication that contained a true threat to injure Victim 2, that is, the following direct messages to Victim 2 on Instagram:

1. "[I]f I see you on the blade, you know what time it is bitch."

2. "Bih I'm going to touch you!  Promise that!"

3. "I'll pull up on your ass as soon as I see you on your ad."

4. "So if I see you, On Western, it's on site if I see you in Pomona, it's on site if I see you in San Bernardino it's on site.  I put that on my kids.  You won't make no money on the blades."

5. "When I see you, I'm gonna touch your fat ass."

6. "You stole from me in front of my whole stable.  I'm going to make an example out of you."

7. "I'm coming for your ass."

8. "[W]hen your broke ass come home, we'll see."

9. "When you post, I will come see you promise."

10. "You know what it is when I see you."

21

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 1594(d) and 28 U.S.C. § 2461]

1. Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 1594(d), and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction of any of the offenses set forth in any of Counts One, Two, Four, or Five of this Indictment.

2. Any defendant so convicted shall forfeit to the United States of America the following:

(a) Any property, real or personal, that was involved in, used, or intended to be used to commit or to facilitate the commission of such violation, and any property traceable to such property;

(b) Any property, real or personal, constituting or derived from, any proceeds that such person obtained, directly or indirectly, as a result of such violation, or any property traceable to such property; and

(c) In the event such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraphs (a) and (b).

3. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), any defendant so convicted shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof: (a)

22

cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION TWO

[18 U.S.C. § 2253]

1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 2253, in the event of any defendant's conviction of the offense set forth in Count Three of this Indictment.

2.    Any defendant so convicted shall forfeit to the United States of America the following property:

(a)  All right, title, and interest in any visual depiction involved in any such offense, or any book, magazine, periodical, film, videotape, or other matter which contains any such visual depiction, which was produced, transported, mailed, shipped or received and involved in any such offense;

(b)  All right, title, and interest in any property, real or personal, constituting or traceable to gross profits or other proceeds obtained from such offense;

(c)  All right, title, and interest in any property, real or personal, used or intended to be used to commit or to promote the commission of such offense or any property traceable to such property; and

(d)  To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraphs (a), (b), and (c).

3.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 2253(b), any defendant so convicted shall forfeit substitute property, up to the

24

total value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION THREE

[18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

1.   Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction of the offense set forth in Count Six of this Indictment.

2.   Any defendant so convicted shall forfeit to the United States of America the following:

(a)  All right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to any of the offenses; and

(b)  To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), any defendant so convicted shall forfeit substitute property, up to the value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property described in the preceding paragraph or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been

//

//

26

substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

A TRUE BILL

/S/_____
Foreperson

TODD BLANCHE
Acting Attorney General

BILAL A. ESSAYLI
First Assistant United States
Attorney

ALEXANDER B. SCHWAB
Assistant United States Attorney
Acting Chief, Criminal Division

KEVIN J. BUTLER
Assistant United States Attorney
Chief, Major Crimes Section

CHELSEA NORELL
MIRELLE RAZA
Assistant United States Attorneys
Major Crimes Section